UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

VERONICA ROBLEDO, individually and on
behalf of all others similarly situated,

                Plaintiffs,

      - against -

NO. 9 PARFUME LEASEHOLD and
LAURICE RAHME, individually,

                Defendants.

------------------------------------------------------------------X

**DECLARATION OF DENNIS A. LALLI**

No. 12 Civ. 3579 (RLC)(DF)

STATE OF NEW YORK    )
                           : ss.:
COUNTY OF NEW YORK )

      I, DENNIS A. LALLI, declare under penalty of perjury that the following is true and correct:

      1.    I am Of Counsel to the law firm of Bond, Schoeneck & King, PLLC. I have been so engaged since May 2008 and am attorney of record for No. 9 Parfume Leasehold ("Parfume") and Laurice Rahme, the defendants in this action. I make this declaration in opposition to plaintiff's *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why Preliminary and/or Permanent Injunction Should Not Issue disqualifying me and my law firm from representing the defendants in this action and enjoining me and my law firm from destroying evidence and suborning perjury in this case (herein the "Application") on my own personal knowledge, except as to matters stated to be on information and belief and as to such matters I believe it to be true.

53763

2. The Application is based on fabricated allegations and distortions of fact for no purpose other than unjustly to impair my credibility with the Court, jeopardize my client's confidence in me, diminish my ability to represent my clients effectively, and harass my clients and me. In addition to the groundless suggestion that I suborned perjury in a wholly collateral proceeding that has no relationship whatsoever with the instant case, plaintiffs seek disqualification on the claim that I could be witness in this case, yet submit no evidence at all to support that assertion. Moreover, and contrary to Local Civil Rule 7.1, they submit no memorandum of law that cites any authority for the proposition that the facts they falsely allege support disqualification. Leaving aside the fact that the material allegations submitted in support of the Application are untrue, nothing alleged in the Application could reasonably be understood in good faith by any attorney familiar with the rules and case law that govern disqualification of attorneys as warranting disqualification. It is entirely apparent that the Application is wholly without color and was filed in bad faith.

### A. There is no basis for the assertion that I will be a witness in this case.

3. The Application states, at p. 2, that my firm and I should be disqualified because I am a fact witness in this case. Yet no allegation in either of the two statements filed in support of the Application contains the remotest basis for concluding that I would be a witness in the instant case, an FLSA action that alleges unpaid overtime wages.

4. I have no personal knowledge concerning Parfume's payroll practices regarding overtime compensation, and neither the affidavit of Karin Widmann (herein the "Widmann affidavit") nor the declaration of Walker G. Harman, Jr. (herein the

50695.1

"Harman declaration") contains any allegation that I do or that there is any reason to believe that I could be called in good faith by either side to testify in this case.

5. The Application states that the affidavit of Hormidas Caloobanan that was recently filed in this action "is a direct product of Mr. Lalli's subornation of perjury." Ms. Caloobanan's affidavit, which was filed by ECF on August 31, 2012 as document no. 20 on the Court's docket of this action, is solely the product of statements that Ms. Caloobanan provided to me in response to my inquiries regarding the manner in which Parfume's semi-monthly payroll system works. The Application does not even allege that any statement in her affidavit is untrue or inaccurate. Based on what Ms. Caloobanan told me and the records she showed me, I firmly believe that every statement it contains is true. Plaintiffs' accusation that the Caloobanan affidavit is a product of the subornation of perjury is completely unsupported and insupportable. Moreover, there is nothing in the Caloobanan affidavit or in the Application which suggests that I might be called by either party in this action to testify as a witness.

6. To be sure, the Widmann affidavit states, at ¶¶ 54 and 56, that I sent her a letter which notified her of the termination of her employment. My letter, a copy of which is appended to Harman declaration filed in support of the Application, also informed Ms. Widmann that Parfume was contemplating asserting certain claims against her based on her "dishonesty, fraud, and actions in [her] own interest at the expense of the Company's interests," and suggested she engage an attorney. I advised that her that Ms. Rahme and I wished to meet with her "or, preferably, with [her] and [her] attorney" in order to resolve Parfume's claims without litigation. A copy of that letter is appended to the Harman Affidavit.

7. The basis for the claims referred to in my letter is set forth at pp. 4-9 of the Statement of Position that I submitted on behalf of Parfume to the New York State Division of Human Rights in April 2012 in opposition to a Complaint of discrimination that Ms. Widmann filed on or about February 21, 2012. A copy of that Statement of Position is appended hereto as exhibit A. In sum, I had been informed, and seen documents which showed, that (a) Ms. Widmann falsely had credited Veronica Robledo, the named plaintiff in this action, with sales that Ms. Robledo never made, with the result that Ms. Robledo was credited with thousands of dollars commissions she had not earned; (b) Ms. Widmann had given and instructed her subordinates to give discounts and free shipping to customers that she was not authorized to give and had been instructed not to give, totaling many thousands of dollars; and (c) Ms. Widmann had failed to follow protocols required by credit card issuers for telephone credit card sales, resulting in fraudulent credit card charges which totaled in excess of $16,000 as of the date my letter was sent to Ms. Widmann.

8. These issues are wholly unrelated to any facts or claims that are alleged in the instant FLSA and wage payment action, and even if they were, I would not be an appropriate fact witness concerning any of them because I have no personal knowledge concerning any of them.

9. I wish to point out that even though paragraph 2 of the Widmann affidavit states that I and my firm should be disqualified because my "own recollections and statement are directly at issue," neither her affidavit nor the Harman declaration identifies a single fact in the instant case to which I might be a witness. Nor, since counsel for the plaintiff seems have been unable to bestir himself to prepare a

memorandum of law in support of the Application, does the Application identify any authority to support the contention that I or my firm should be disqualified because of the letters I sent to Ms. Widmann and Ms. Robledo. The Application makes many accusations but is completely devoid of allegations of fact or citations to legal authority to substantiate any of therm.

### B. I did not direct anyone to provide false testimony.

10. The Widmann affidavit contains many wholly conclusory statements to the effect that I engaged in unethical or unlawful conduct on numerous occasions. For example, paragraph 2 states – under oath – that I have a "history of pressuring witnesses to commit perjury." Yet the Widmann affidavit describes only one proceeding in which I prepared Parfume's witnesses for testimony; that is, a hearing on an application for unemployment insurance benefits that a former employee named Joan Bolick had filed. And she cites no evidence whatsoever that I pressured anyone to provide false, much less perjurious, testimony.

11. The Joan Bolick proceeding arose from an incident that Laurice Rahme, the owner of Parfume, consulted me about on August 9, 2011. On that day, a Tuesday, Ms. Rahme told me that she had met with Ms. Bolick and informed her that the coming Friday would be Ms. Bolick's last day of work because of certain things Ms. Bolick had told other employees that Ms. Rahme regarded as disloyal. She said that during their conversation, Ms. Bolick had raised her voice and behaved aggressively; that she (Ms. Rahme) had told Ms. Bolick to lower her voice; that Ms. Bolick had said that Ms. Rahme had no right to tell her (Ms. Bolick) to lower her voice; that she (Ms. Rahme) had said that she did indeed have that right because she was Ms. Bolick's boss; and that Ms.

Bolick said that Ms. Rahme was no longer her boss because she was quitting and then walked away from her job rather than work through the end of the week. Ms. Rahme asked me whether Ms. Bolick would be eligible for unemployment insurance benefits. I advised that it was my understanding that under New York law, the fact that Ms. Bolick had left her employment voluntarily three days before she was to be discharged meant that the Unemployment Division of the New York State Department of Labor would treat her as having resigned, and therefore as ineligible for benefits.

12. In September or October 2011, Parfume received notice of a determination of the New York State Department of Labor that Ms. Bolick's application for unemployment insurance benefits had been granted on the ground that Ms. Bolick did not resign but rather had been fired. At Ms. Rahme's request I filed an appeal. In October 2011 Parfume received notice that a hearing would be held on Parfume's appeal on October 31, 2011. Ms. Rahme asked me to represent Parfume at that hearing. I agreed.

13. During the period prior to the hearing, Ms. Rahme explained to me in telephone conversations that the meeting in which Ms. Bolick had told her, in essence, "you can't fire me because I quit," had taken place in Parfume's flagship store located at 9 Bond Street in Manhattan and that Ms. Widmann had been standing 20-30 feet away and could observe what happened. She said that when Ms. Bolick ended the conversation, Ms. Bolick went downstairs to her desk in Parfume's administrative offices and left her keys there before then proceeding to her (Ms. Bolick's) other desk at Parfume's office suite located at 42 Bond Street. Ms. Rahme stated that Christine Piccolo, a Parfume executive employee, who worked at the 42 Bond Street location, had observed Ms. Bolick pack her personal belongings into a suitcase that Ms. Bolick

50695.1

had left in the office the day before, heard Ms. Bolick say that she had quit, and seen Ms. Bolick leave her company-provided Blackberry device on her desk before Ms. Bolick then walked out of the office before noon and leave for good.

14. In order to prepare for the October 31 hearing, I went to the store at 9 Bond Street on Friday, October 28, 2011 to meet with Ms. Rahme, Ms. Widmann, and Ms. Piccola, as well as with Hormidas Caloobanan and Lisa Lisanti, whom Ms. Rahme told me also might have relevant information. I asked each of them what they remembered about the incident on August 9 in which Ms. Bolick's employment had ended. What Mses. Rahme, Widmann, and Piccola told me comported with what Ms. Rahme had explained earlier. I learned in addition that when Ms. Bolick left the premises at 9 Bond Street, Ms. Rahme had asked Ms. Caloobanan to follow Ms. Bolick to retrieve her company-provided Blackberry device and any other company property that Ms. Bolick might have, and that Ms. Caloobanan was present at the 42 Bond Street offices to observe the same conduct that Ms. Piccola had observed.

15. Inasmuch as what Ms. Caloobanan had observed appeared to be cumulative as what Ms. Piccola had observed, I concluded that I did not need Ms. Caloobanan to come to the hearing to testify. I also concluded that the potential testimony of Lena Lisanti, another Parfume employee I had interviewed that day, was not relevant because it went only to the Bolick comments that Ms. Rahme regarded as disloyal, and were not probative as to whether Ms. Bolick had walked out voluntarily or been fired.

50695.1

16.     Accordingly, I decided to bring only Ms. Rahme, Ms. Widmann, and Ms. Piccola as witnesses to the October 31 hearing, and so on Sunday, October 30, I prepared direct testimony questions for only these three.

17.     The hearing was to begin at 9:30 a.m., so I met with Ms. Rahme, Ms. Widmann, and Ms. Piccola very early that morning to prepare them for their testimony. I provided each of them a list of the questions I would be asking. A copy of the list of direct examination questions I gave to Ms. Widmann is appended hereto as exhibit B.

18.     Before we went over the questions, I cautioned each of these witnesses that it was critical to tell the truth, and to testify only from personal knowledge, not to anything they had not seen or heard with their own eyes or ears. I did not direct anyone what to say or to say anything that was contrary to their own personal knowledge.

19.     The only documents I gave to these witnesses were lists of questions that I expected to ask them on direct examination. I did not refer to those lists as "cheat sheets" and no one else referred to them as "cheat sheets," certainly not in my presence.

20.     During our meeting on October 28 and our preparation before the hearing on October 31, Ms. Widmann told me that she remembered the meeting between Ms. Rahme and Ms. Bolick that preceded the end of Ms. Bolick's employment, and confirmed that August 9 sounded about right as the date when it happened. She told me she was 20-30 feet away (we paced the distance off, in order to be sure) and that while she could not hear what they were saying she definitely heard Ms. Bolick raise her voice and saw her gesticulate in an aggressive manner before just walking away from Ms. Rahme. I told her that I would like for her so to testify at the hearing.

21.     At the hearing on October 31, I put Ms. Widmann on as my first witness so that she could return to the store when she was done and would not have to spend her entire morning at the hearing. After a few questions, however, the administrative law judge instructed me to have Ms. Rahme testify first, so Ms. Widmann was sent out of the room.

22.     The hearing did not close that day because counsel for the claimant said he had another unemployment insurance hearing to attend in Brooklyn that morning and could not stay for the full amount of time allotted for our hearing. Accordingly, the hearing was adjourned to another date, which Parfume later received notice would be on January 31, 2012.

23.     The January 31, 2012 continuation of the hearing was scheduled to take place in the afternoon. I met again with our witnesses that morning. Ms. Rahme had testified on October 31, so we did not use the set of direct examination questions we had used on October 31. For Ms. Piccola, who had not testified, and for Ms. Widmann, whose testimony was taken only partially, we used the same lists of direct examination questions we had used on October 31.

24.     I also spent time that morning to prepare Ms. Caloobanan for testimony, inasmuch as Ms. Bolick's testimony on October 31 was contrary to what Ms. Rahme had told me earlier that Ms. Caloobanan had reported to her. However, I did not prepare a list of direct examination questions for Ms. Caloobanan, because of the limited extent of her testimony and the ease of preparing her for it without a written list of questions. As for Ms. Caloobanan, there was no document that could conceivably have been characterized as a "cheat sheet."

50695.1

25. During these preparations I repeated my admonition to testify truthfully and only on the basis of personal knowledge.

26. On January 31, 2012, Ms. Widmann, Ms. Rahme, Ms. Piccola, Ms. Caloobanan, and I all rode together from the Parfume store to the location of the Bolick unemployment insurance hearing in an automobile owned by Parfume. While in the car we discussed some of the questions some of these witnesses might be asked. I do not recall specifically any part of the conversations I had during that ride with Ms. Widmann. It is entirely possible that I asked her to describe the aggressive gesticulations she told me on October 28 and 31 she had observed Ms. Bolick make toward Ms. Rahme, in order to make sure she was prepared to testify concerning those gesticulations. However, I did not tell her what I "wanted [her] to say" or to testify to anything untruthful.

27. Ms. Caloobanan is a shy woman whose English is accented. To my knowledge, she had never testified before in a judicial or administrative proceeding and appeared to be nervous about being questioned in such a forum. At the hearing, she testified with excellent testimonial demeanor, and described the events to which she testified in the same way she had described them to me during our preparations. I did indeed praise her for testifying truthfully and for not being intimidated by the setting. I did not refer to "repeat[ing] her lines" in any manner whatsoever.

28. The administrative law judge sequestered Parfume's witnesses at both the October 31 and January 31 hearing dates. Ms. Widmann was not in a position to hear the testimony of any other witness during the entire proceedings.

10

50695.1

29. I never told any witness to testify falsely, and specifically instructed all of the witnesses to testify only to the truth and to testify only to matters that they knew from their own personal knowledge.

### C. The Widmann affidavit is laced with inaccuracies and distortions.

30. The Widmann affidavit is laced with inaccuracies, distortions, exaggerations, and mischaracterizations. Some of the inaccuracies seem to be mere failures of memory, but others appear to be so far-fetched as to be conscious misrepresentations. Taken together, however, whether intentional or not, they tend to cast substantial doubt on any allegation that I engaged in improper or unethical behavior.

31. At paragraph 9, Ms. Widmann states that she saw me at the Parfume store not less than 10 times. That is untrue. I can recall being at the Parfume store only three times during the period of Ms. Widmann's employment by Parfume (*i.e.*, from July 5, 2011 to February 15, 2012, as alleged at paragraph 7); that is, on October 28 and 31, 2011 and on January 31, 2012, on the occasions discussed above. I have reviewed my time records and my firm's statements to Parfume for services rendered, and they confirm these dates and these dates alone. Those records reflect that I was at the Parfume store where Ms. Widmann worked on October 28 and 31, 2011 and January 31, 2012, and they do not contain any record that I was at the store at any other date than those. Moreover, I have never been to the Parfume offices located at 42 Bond Street.

32. At paragraph 10, Ms. Widmann states that when she first began working at the Parfume store in July 2011, she saw me speaking with other employees,

11

including former Store Manager Michelle Vasapoli. I did not visit the store at all in July, August, or September 2011, or meet with any of defendants' employees there during those months. October 28, 2011 was the first time I recall or my records indicate I visited the store after July 5, 2011. I did not meet with Ms. Vasopoli until after Ms. Widmann had already been fired.

33.  At paragraph 15, Ms. Widmann states that she "personally saw [me] work closely with Ms. Piccola and Ms. Caloobanan to review and rehearse proposed witness statements and testimony." I have a duty as an attorney to represent my clients effectively. I am aware that that duty includes assuring that witnesses are prepared to testify truthfully and effectively when examined under oath in formal judicial or administrative proceedings. Ms. Widmann's allegation accuses me of engaging in proper, ethical conduct, not improper or unethical conduct.

34.  Ms. Widmann states at paragraphs 19, 40, and 44 of her affidavit that the conversation between Ms. Rahme and Ms. Bolick on August 9 was conducted in low tones and that neither raised her voice to the other; she also says that she told me she could not testify at a hearing to the effect that Ms. Bolick raised her voice to Ms. Rahme. However, she told me on October 28 and 31, 2011 that Ms. Bolick had raised her voice to Ms. Rahme and gestured toward her in an aggressive manner. I put her on as a witness specifically to so testify (see the pages from the transcript appended hereto as exhibit C), which I certainly would not have done if she had told me that neither had raised her voice to the other. Moreover, Ms. Rahme consistently maintained that Ms. Bolick had raised her voice but Ms. Rahme had not, and Ms. Bolick consistently maintained that Ms. Rahme had raised her voice and that she, Ms. Bolick had not. (See

50695.1

exhibit D, appended hereto, a document that I copied from the Unemployment Insurance Division's file.) Ms. Widmann's affidavit testimony concerning the August 9 conversation between Ms. Rahme and Ms. Bolick is not only contrary to what she told me, it is contrary to the testimony of both Ms. Rahme and Ms. Bolick.

35. Ms. Widmann states at paragraph 21 of her affidavit that when the August 9 conversation between Ms. Rahme and Ms. Bolick ended, Ms. Bolick walked past Ms. Widmann with tears in her eyes and out the door. However, both Ms. Rahme and Ms. Bolick testified that Ms. Bolick went to her desk downstairs when she left Ms. Rahme, and left the store only after leaving her keys on that desk.

36. At paragraph 26 of her affidavit, Ms. Widmann states that I came to the store "[s]everal days after this incident" to discuss what she would say about it. As noted above, I did not visit the store after the date Ms. Widmann was hired until October 28, 2011.

37. Ms. Widmann also states at paragraphs 26 and 34 of her affidavit that I told her I would like her to testify that she saw Ms. Bolick threaten Ms. Rahme physically and make "threatening movements" toward her. No one had ever told me that Ms. Bolick had engaged in physically threatening behavior toward Ms. Rahme and I never asked anyone, including Ms. Widmann, whether they could testify to such conduct. Ms. Widmann did tell me, confirming what Ms. Rahme had recounted, that Ms. Bolick had made aggressive *gestures* toward Ms. Rahme. After Ms. Widmann told me she had observed such conduct, I later prepared her to so testify by reminding her of what she had told me and telling her the question I would pose in order to elicit her testimony to that effect. I did not ask her whether she would testify to physically threatening behavior.

38. Paragraph 27 of the Widmann affidavit says that I "*repeatedly* pressured [Ms. Widmann] to say things that [she] knew were not true and that [she] told [me] were not true." (Emphasis added.) This statement is false. There are only two allegations in the entire Widmann affidavit which state that I attempted to get her to testify falsely. One is her assertion that I asked her to testify that Ms. Bolick raised her voice to Ms. Rahme, and the other is that I asked her to testify that Ms. Bolick threatened Ms. Rahme physically. Both of those assertions are false, for the reasons stated above. Moreover, Ms. Widmann makes no other allegations that I "coached" her testimony or attempted to persuade her to say something false with any specificity whatsoever; all such allegations are wholly conclusory or general, completely lacking in any substance at all.

39. Paragraph 28 of Ms. Widmann's affidavit says that she "personally witnessed [me] attempting to get Ms. Caloobanan to lie on behalf of the Defendants on numerous occasions," and paragraph 32 says she "personally witnessed [me] aggressively coach Ms. Caloobanan between five (5) and ten (10) different times." The only times Ms. Widmann could possibly have seen me meet with Ms. Caloobanan were on October 28, 2011, when I interviewed Ms. Caloobanan to learn the facts about the Bolick case, and on January 31, 2012, to prepare her for testimony, for those are the only times I met with Ms. Caloobanan at the store during Ms. Widmann's short tenure there before she was fired for misconduct.

40. Paragraph 30 of Ms. Widmann's affidavit says that she "personally witnessed [me], on numerous occasions, provide Ms. Caloobanan with pieces of paper that [I] referred to as 'cheat sheets,' which, in fact, were statements prepared by [me] which [I] wanted Ms. Caloobanan to review and memorize." As stated above, the only

50695.1

time I prepared Ms. Caloobanan for testimony at any hearing was on January 31, 2012, so Ms. Widmann's statement that she saw me with Ms. Caloobanan at the store five to ten times is necessarily false. It is also false that I gave Ms. Caloobanan "cheat sheets" because, as also stated above, while I prepared lists of direct testimony questions for Ms. Rahme, Ms. Widmann, and Ms. Piccola on October 30 and provided those lists to these witnesses on October 31, I did not make any such list for Ms. Caloobanan at all. Any testimony that Ms. Widmann saw me give Ms. Caloobanan a "cheat sheet" at any time is false, and I cannot conceive that it is not knowingly false.

41.    Paragraphs 45-48 of the Widmann affidavit say, somewhat contradictorily, that I instructed Ms. Piccola to say that when Ms. Bolick went to the office at 42 Bond Street on August 9, she threw her Blackberry at Ms. Caloobanan, and that I instructed Ms. Piccola and Ms. Caloobanan to say that when Ms. Caloobanan followed Ms. Bolick to 42 Bond Street, it was not to retrieve Ms. Bolick's company-provided Blackberry, but rather to get an invoice. This is false. I had been informed that after Ms. Bolick told Ms. Rahme she was quitting, Ms. Rahme told Ms. Caloobanan to go after Ms. Bolick to retrieve the Blackberry, and that when Ms. Caloobanan asked Ms. Bolick for the Blackberry Ms. Bolick indicated that she had left it on her desk. This is the testimony Ms. Caloobanan said she was going to provide when we prepared on the morning of January 31, and it is the testimony she provided. (A copy of the transcript of Ms. Caloobanan's testimony the January 31 proceedings is attached hereto as exhibit E.)

42.    Paragraph 52 of the Widmann affidavit states that there had been two hearings in the Joan Bolick matter prior to the one on January 31, 2012. This is inaccurate. There was only one; that is, the hearing of October 31, 2011.

50695.1

43.    I believe that Ms. Widmann's affidavit is so riddled with inaccuracies and false statements that it should be disregarded completely.

44.    I believe further that (a) the utter void of evidence that I should be disqualified under the legal standards that govern attorney disqualification, coupled with (b) quantity of conclusory allegations of improper witness coaching as compared with the paucity of allegations that might conceivably support a finding of improper witness coaching and (c) the complete lack of any connection between the supposed witness coaching in the Bolick unemployment insurance matter and the instant FLSA case compels the conclusion that the Application is entirely without color and brought in bad faith. I believe that it would be appropriate for the Court to exercise its discretion pursuant to 28 U.S.C. § 1927 *sua sponte* to sanction the plaintiffs and their attorneys for filing the Application.

45.    If the Court does not see fit to deny the Application or to award sanctions on the basis of the papers submitted in support of and in opposition to the Application, I urge the Court to allow expedited discovery and a prompt hearing. Plaintiffs' baseless claim that I suborned perjury should not be permitted to stand for anyone to see without my having an opportunity to clear my good name and that of my law firm in open court.

_____
Dennis A. Lalli

Dated:    New York, New York
           October 17, 2012