UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
VERONICA ROBLEDO, Individually And On Behalf Of
All Other Persons Similarly Situated,

                                     *Plaintiffs*,

                  -against-

No. 9 PARFUME LEASEHOLD,
LAURICE & CO. UPTOWN, INC.,
LAURICE WASHINGTON LTD.,
LAURICE & BLEECKER CORP.,
LAURICE SOUTHAMPTON, INC.,
LAURICE MADISON LTD., and
LAURICE RAHME, Individually,

                                     *Defendants*.
-----------------------------------------------------------------------X

12 CV 3579 (ALC)(DCF)

OCTOBER 31, 2012
AFFIDAVIT OF
KARIN MARIA WIDMANN
IN REPLY TO OCTOBER 17,
2012 DECLARATION OF
DENNIS A. LALLI
CONCERNING PENDING
APPLICATION FOR
ATTORNEY
<u>DISQUALIFICATION</u>

        **KARIN MARIA WIDMANN**, being duly sworn, and subject to the penalties for perjury, deposes and says:

1.      I previously signed an Affidavit in this action, on September 25, 2012.

2.      My September 25, 2012 Affidavit is entitled "Affidavit of Karin Maria Widmann Regarding Her Interactions With Attorney Dennis A. Lalli During The Course Of Her Employment With Defendants." It is eleven pages in length and consists of 59 separately numbered paragraphs.

3.      A copy of my September 25, 2012 Affidavit is attached hereto as Exhibit A.

4.      Prior to signing this present Affidavit today, Wednesday, October 31, 2012, I reviewed my September 25, 2012 Affidavit.

5.      I continue to maintain that all of the statements in my September 25, 2012 Affidavit are true and correct. I do not wish to in any way modify or qualify any of the statements in my September 25, 2012 Affidavit.

6.      Within the past two weeks, I have had the opportunity to read the Declaration of Dennis A. Lalli which was filed in this matter. Mr. Lalli's Declaration is dated October 17, 2012.

7.    A copy of Mr. Lalli's October 17, 2012 Declaration is attached hereto as Exhibit B.

8.    Mr. Lalli's Declaration states that it is made on his own personal knowledge, except where otherwise stated.

9.    Upon careful review of Mr. Lalli's Declaration, I strongly disagree with many of the statements in it, particularly those statements regarding my actions during the course of my employment with the Defendants.

10.    It is apparent to me that Mr. Lalli is directly attacking my credibility. In fact, he expressly says so:

> I believe that Ms. Widmann's affidavit is so riddled with inaccuracies and false statements that it should be disregarded completely.

Lalli Declaration, ¶ 43.

11.    In his Declaration, Mr. Lalli suggests that the Court should accept all of his statements as true, and simultaneously requests that the Court simply reject or ignore my September 25, 2012 Affidavit. As stated in the preceding paragraph, he states "it [my Affidavit] should be disregarded completely."

12.    Mr. Lalli essentially asks the Court to disregard everything that I said about him simply because Mr. Lalli does not believe that I am telling the truth and also because my recollection of certain events are inconsistent with his.

13.    It is clear to me that my Affidavit and Mr. Lalli's Declaration are fundamentally inconsistent and irreconcilable with one another. Placing the two documents side by side, it is obvious that major factual disputes exist between the two of us about certain events that we witnessed and participated in.

14.    As I stated in my September 25, 2012 Affidavit, I recall Mr. Lalli being present at, and directly participating in, many of the meetings and discussions that are described or referred to in my Affidavit, as well as in his subsequently filed Declaration, which he contends is based on his personal knowledge.

15.    I am prepared to testify regarding those matters that Mr. Lalli factually disagrees with me about. I reiterate ¶ 59 of my September 25, 2012 Declaration in which I stated that I was prepared to testify live in open court regarding the incidents described in that Affidavit.

16.    I do not believe that the many serious factual disputes that exist between Mr. Lalli and me can be resolved unless the Court decides to believe one of us and not the other. As I stated in ¶ 13, I believe that my September 25, 2012 Affidavit and his October 17, 2012 Declaration are fundamentally irreconcilable.

17. As I stated in my September 25, 2012 Affidavit, I met and interacted with Mr. Lalli during my employment with the Defendants. He visited the Bond 9 store where I worked on many occasions (September 25, 2012 Widmann Affidavit, ¶¶ 9-13).

18. I have no idea whether Mr. Lalli or his firm billed Ms. Rahme for each visit to one of her stores. I also do not know whether each of Mr. Lalli's visits was memorialized in a billable time entry that would subsequently be reflected in the time and billing records of Mr. Lalli's firm. If Mr. Lalli did not record each visit on a timesheet, or if he and his firm did not send out an itemized billing statement for each visit, I would not know that.

19. I specifically disagree with Paragraph 31 of Mr. Lalli's Declaration in which he states that my recollection that I saw him at the Bond 9 store not less than ten times "is untrue." I maintain that I saw at the store no fewer than ten times.

20. The fact that Mr. Lalli alleges that he recalls only being at the store three times, and the fact that he alleges that he has reviewed his time records and his firm's invoices to the Defendants has not caused me to change my mind about how many times I recall seeing him at the store.

21. Ms. Rahme, the owner of the Bond 9 store, was the individual who introduced me to Mr. Lalli. She repeatedly told me and other employees that we should try to get to know Mr. Lalli better by talking to him about our work and work-related activities and issues.

22. Ms. Rahme specifically told me that I should expect to see Mr. Lalli at the store from time to time and that I should become friendly with him.

23. Ms. Rahme referred to Mr. Lalli as "Dennis" and encouraged us to do the same. Mr. Lalli or Dennis also referred to us using our first names. He called me Karin.

24. Ms. Rahme encouraged me and other employees to speak with Mr. Lalli even when there was no particular legal issue pending that we needed to consult with him about.

25. Mr. Lalli appeared to have a very close relationship with Ms. Rahme. In my view, Ms. Rahme considered Mr. Lalli to be a member of her business team, and not simply an outside counsel to be consulted on infrequent occasions.

26. By the time my employment with the Defendants ended, Mr. Lalli and I had spoken on many occasions. I have, however, not spoken with him since my employment ended.

27. Paragraph 5 of Mr. Lalli's Declaration refers to an Affidavit of Hormidas Caloobanan (another one of Ms. Rahme's employees), which was filed in this action on or about August 31, 2012.

28. Paragraph 5 of Mr. Lalli's Declaration states that "[b]ased on what Mr. Caloobanan told me and the records she showed me, I firmly believed that every statement it contains is true."

29. I have had the opportunity to carefully review Mr. Caloobanan's Declaration.

30. Based on personal knowledge that I acquired in the course of my employment with the Defendants (during which time I frequently interacted with both Mr. Lalli and Ms. Caloobanan), I believe that many of the statements in Ms. Caloobanan's Affidavit are untrue.

31. As I detailed in my September 25, 2012 Affidavit, I personally observed Mr. Lalli telling Ms. Caloobanan what to say and how to say it in advance of her testifying under oath. Afterwards, in Ms. Rahme's presence (as well as my own), Mr. Lalli congratulated Ms. Caloobanan for repeating her lines perfectly (September 25, 2012 Widmann Affidavit, ¶¶ 28-33, 48, 51-53). He told Ms. Rahme that Ms. Caloobanan's testimony was "excellent." In response, Ms. Rahme praised her for being a "superstar."

32. Based on my own personal interactions with Ms. Caloobanan during my employment, it is my view that she is a decent and very religious person. However, Ms. Caloobanan, who is not originally from the United States, also is extremely nervous and easily intimidated.

33. I recall that Ms. Caloobanan was particularly intimidated by Ms. Rahme. This was because Ms. Rahme was Ms. Caloobanan's boss and the sole owner of the various stores at issue in this action. Ms. Rahme could have terminated Ms. Caloobanan's employment without notice for shortcomings such as perceived disloyalty to Ms. Rahme.

34. I recall that Ms. Caloobanan would become extremely nervous or anxious whenever she was asked to testify on behalf of Ms. Rahme in legal proceedings. As I stated previously, "Ms. Caloobanan would physically shake with fear" (September 25, 2012 Widmann Affidavit, ¶ 29).

35. I specifically recall Ms. Caloobanan, who is a devout Roman Catholic, praying and expressing concern for the safety of her daughter on at least one occasion when she was directed to testify on behalf of Ms. Rahme.

36. Paragraph 7 of Mr. Lalli's Declaration contains serious allegations against me regarding financial misconduct or impropriety at the Bond 9 store where I worked. Specifically, Mr. Lalli alleges that as a store manager I falsely credited a sales employee, Ms. Veronica Robledo, with sales she never made (resulting in "thousands of dollars" in unearned commissions), arranged for unauthorized discounts and free shipping to customers (totaling "many thousands of dollars"), and breached credit card security protocols (resulting in over $16,000 of fraudulent credit card charges).

37. I strongly reject the allegations in Paragraph 7 of Mr. Lalli's Declaration, and request the opportunity to personally rebut them in open court.

38. In fact, I would like to have my attorneys question Mr. Lalli about: (a) his allegations against me, which appear to be allegations of arguably criminal conduct; and, (b) his own affirmative conduct.

39. I am confident that if given the opportunity, Mr. Lalli would have me examined by his attorneys about my statements regarding his conduct. I therefore feel that I should have an opportunity to have Mr. Lalli examined about the extremely serious and deeply offensive accusations he has made against me.

40. In Paragraph 6 of his Declaration, Mr. Lalli admits that he encouraged me to consider retaining an attorney in order to respond to his allegations at the time of my termination. He also admits that he requested that I (with or without my attorney) meet with him and Ms. Rahme to discuss these allegations. When I was terminated, he called me at home to request a meeting and said "Karin, I want to meet with you - let us put this insanity behind us."

41. I certainly regard the allegations that Mr. Lalli has made against me to constitute an irreconcilable and serious factual dispute between me and Mr. Lalli.

42. Paragraph 11 of Mr. Lalli's Declaration discusses an incident involving Ms. Rahme and another one of her former employee, Ms. Joan Bolick. In Paragraph 11, Mr. Lalli describes what Ms. Rahme told him about her August 9, 2011 meeting with Ms. Bolick during which Ms. Rahme either terminated Ms. Bolick or stated that she intended to terminate her by the end of the week for making "disloyal" statements.

43. Paragraphs 11-13 of Mr. Lalli's Declaration describe events regarding Ms. Bolick' termination, but does not describe anything that I told Mr. Lalli about what I observed on that day.

44. Paragraph 14 of Mr. Lalli's Declaration states that on or about October 28, 2011, Mr. Lalli went to the Bond 9 store to meet with various people, including me regarding the incident involving Joan Bolick.

5

45. That Mr. Lalli may have visited the store on or about October 28, 2011 to meet with Ms. Rahme and her employees would not, in and of itself, have been unusual. As stated, Mr. Lalli often visited the store throughout my employment. Ms. Rahme encouraged her employees to interact with him and to get to know him better because he was, in Ms. Rahme's words, "a superstar."

46. It also was not unusual for Mr. Lalli to visit the store to discuss specific employee incidents, since Ms. Rahme had many disputes with current and former employees and sought to involve Mr. Lalli in these disputes and incidents. As I stated in my September 25, 2012 Affidavit, I recall Ms. Rahme stating that "no matter what, no one gets to collect unemployment" and that she would personally oppose or contest any unemployment claims filed against her company unless they were so simple that they could be delegated to others to handle (September 25, 2012 Widmann Affidavit, ¶ 50).

47. I specifically disagree with Paragraph 14 of Mr. Lalli's Declaration in which Mr. Lalli alleges that when he asked me about what I recalled about Ms. Rahme's last meeting with Ms. Bolick, I responded in a way that "comported with what Ms. Rahme had explained earlier." If what Mr. Lalli is referring to is the version of events set out in Paragraphs 11-13 of his Declaration, I never responded in a way that comported with that version of events.

48. I specifically told Mr. Lalli that I had no recollection of hearing or seeing either Ms. Rahme or Ms. Bolick threaten one another, or gesticulate or physically move toward one another in an aggressive or threatening matter.

49. I specifically recall that shortly after Ms. Bolick walked out of the front door, Ms. Rahme told me "you see, I fired her."

50. I did not hear or see Ms. Bolick threaten Ms. Rahme or move toward her in a threatening or aggressive manner. I never told anyone that I heard or saw Mr. Bolick threaten Ms. Rahme or make threatening or aggressive gestures towards her.

51. I specifically recall that Mr. Lalli told me that he wanted me to testify, at a hearing, that I either saw or heard Ms. Bolick move towards Ms. Rahme in a threatening manner.

52. I specifically recall repeatedly explaining to Mr. Lalli that I could not, and would not, testify that I saw Ms. Bolick threaten or move aggressively towards Ms. Rahme.

53. I specifically recall Mr. Lalli expressing his dissatisfaction with the fact that I was unwilling to testify that I saw Ms. Bolick engage in any threatening acts or gestures directed against Ms. Rahme.

54.     I specifically recall Mr. Lalli telling me how he wanted me to demonstrate to a judge or hearing officer how I saw Ms. Bolick grab the arms of her chair and lunge, spring or move towards Ms. Rahme. I repeatedly told him that I would not testify that I saw this, because I had not, and I was not willing to lie under oath.

55.     Mr. Lalli told me that he wanted me to come to a hearing involving Mr. Bolick anyway.

56.     I strongly disagree with Paragraph 20 of Mr. Lalli's Declaration, in which he asserts yet again that I told him that I heard Ms. Bolick raise her voice and gesticulate in an aggressive manner during her August 9, 2012 meeting with Ms. Rahme. I did not hear or see such things.

57.     I specifically recall Ms. Caloobanan being directed by Mr. Lalli to testify at the hearing regarding Ms. Bolick's last day of employment.

58.     I specifically recall Ms. Caloobanan studying a paper that Mr. Lalli had prepared for her, and trying to memorize and recite its contents. I specifically recall Mr. Lalli encouraging Ms. Caloobanan to memorize and recite its contents.

59.     I strongly disagree with the statement in Paragraph 24 of Mr. Lalli's Declaration that "[a]s for Ms. Caloobanan, there was no document that could conceivably have been described as a 'cheat sheet.'" In fact, I consider the document that I saw Mr. Lalli provide to Ms. Caloobanan, which she was then directed to memorize and recite, to be a cheat sheet.

60.     I strongly disagree with the statement in Paragraph 27 of Mr. Lalli's Declaration that Mr. Lalli praised Ms. Caloobanan for "testifying truthfully." I recall that Mr. Lalli praised Mr. Caloobanan for testifying in the manner in which Mr. Lalli had directed her to testify. I previously stated that Mr. Lalli told Ms. Rahme, in Ms. Caloobanan's (and my) presence "Hormidas [Caloobanan] did excellent, she repeated her lines perfectly, and she seemed a little nervous which came across great" (September 25, 2012 Widmann Affidavit, at ¶ 51).

61.     Paragraph 30 of Mr. Lalli's Declaration states that my September 25, 2012 Affidavit is "laced with inaccuracies, distortions, exaggerations, and mischaracterizations."

62.     In fact, Mr. Lalli's words accurately describe how I feel about his October 17, 2012 Declaration.

63.     In my view, it would be an extreme injustice if my two Affidavits are rejected simply because Mr. Lalli does not believe or like them. It would be a double injustice if Mr. Lalli's Declaration is accepted as a statement of undisputed facts, simply because Mr. Lalli is an attorney and may contend that he should not be questioned his Declaration which is based on his personal knowledge.

7

64. While I am not an attorney and am unfamiliar with the rules governing the conduct of attorneys, I certainly have personal knowledge of my observations of, and interactions with, Mr. Lalli, who I met and spoke with on many occasions.

65. In Paragraph 34 of Mr. Lalli's Declaration, he states that my Affidavit statements regarding what I recalled about the last meeting between Ms. Rahme and Ms. Bolick are "contrary to the testimony of both Ms. Rahme and Ms. Bolick."

66. This is essentially the only factual assertion in Mr. Lalli's Decaration that I may agree with. I repeatedly told Mr. Lalli that I did not see either woman threaten the other. Therefore, if Ms. Rahme and Ms. Bolick each alleged that the other threatened her, then it is true that I do not recall that behavior.

67. In Paragraph 34 of his Declaration, Mr. Lalli criticizes me for maintaining a position that "is contrary to the testimony" of the person (Ms. Bolick) whose testimony Mr. Lalli was attempting to discredit. I do not understand his criticism of me for **not** corroborating what Ms. Bolick, the opposing party, may have said about her alleged confrontation with Ms. Rahme, Mr. Lalli's client.

68. In Paragraph 35 of his Declaration, Mr. Lalli appears to criticize me for failing to recall whether Ms. Bolick went to her desk downstairs before walking out the door. As I have stated, I was not involved in the discussion between Ms. Rahme and Ms. Bolick. I simply recall that: (a) I arrived at work to prepare to open the store to customers, and from a distance observed the two of them speaking with one another; (b) at some point the discussion ended and Ms. Bolick walked out of the front door while Ms. Rahme came up to the front door and exhorted Ms. Caloobanan to go out into the street and run after Ms. Bolick; and, (c) Ms. Rahme told me "you see, I fired her [Joan Bolick]."

69. It is entirely possible that Ms. Bolick may have went to her desk downstairs prior to walking out the door. My inability to recall whether this happened is not surprising given my non-involvement in the discussion as well as my inability to recall anyone threatening or gesticulating to anyone else.

70. I note that I never stated one way or the other whether Ms. Bolick did anything or went anywhere between the end of her discussion with Ms. Rahme and her walking out the front door (September 25, 2012 Widmann Affidavit, ¶¶ 19-21). That is because I have no recollection one way or the other.

71. As I stated in my September 25, 2012 Affidavit, Ms. Bolick was not a sales employee at the Bond 9 store where I ostensibly was the "store manager." Ms. Bolick was the corporate-wide Director of Product Development and reported directly to Ms. Rahme. I did not have any role whatsoever in supervising, monitoring or evaluating Ms. Bolick's work for Ms. Rahme.

8

72.    On the date in question, August 9, 2011, my job as the so-called store manager was to arrive before opening time and prepare the store to open on time. It was most definitely not my job to intervene in, or even concern myself with, any discussions or disputes between Ms. Rahme and her corporate-wide Director of Product Development, Ms. Bolick

73.    In Paragraph 37 of his Declaration, Mr. Lalli appears to make a substantive distinction between "threatening movements" and "aggressive gestures". Since I do not recall either Ms. Rahme or Ms. Bolick engaging in any behavior that I would classify as either "threatening movements" or "aggressive gestures" I am unable to engage in a disagreement with Mr. Lalli as to what such a distinction might be.

74.    I specifically recall attending more than one hearing regarding Ms. Bolick's employment and the circumstances under which it ended.

75.    Based on my personal interactions with Mr. Lalli, Ms. Rahme and others during my employment, it is my belief that Ms. Rahme integrated or incorporated Mr. Lalli into her business operations and encouraged her employees to view and treat him as a co-worker and team member rather than as an outside litigation counsel.

76.    As previously stated in ¶ 15, I am prepared to testify live in open court regarding the incidents detailed herein. I will be extremely disappointed if my two Affidavits are rejected simply because Mr. Lalli does not believe or like them.

_____
KARIN MARIA WIDMANN

Sworn to before me this
31st day of October 2012

_____
Notary Public
State of New York



Peter John Andrews
Notary Public - State of New York
No. 02AN6235372
Qualified in New York County
My Commission Expires 2/07/2015

9