**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

| | |
|---|---|
| VERONICA ROBLEDO, Individually And On Behalf Of All Other Persons Similarly Situated, | 12 Civ. 3579 (ALC)(DCF) |
| *Plaintiffs*, | AUGUST 28, 2013 SUPPLEMENTAL AFFIDAVIT OF VERONICA ROBLEDO IN ADDITIONAL SUPPORT OF MOTION FOR CONDITIONAL OR PRELIMINARY COLLECTIVE ACTION **CERTIFICATION** |
| -against- | |
| No. 9 PARFUME LEASEHOLD, LAURICE & CO. UPTOWN, INC., LAURICE WASHINGTON LTD., LAURICE & BLEECKER CORP., LAURICE SOUTHAMPTON, INC., LAURICE MADISON LTD., and LAURICE RAHME, Individually, | |
| *Defendants.* | |

-----------------------------------------------------------------------X

VERONICA ROBLEDO, being duly sworn, and subject to the penalties for perjury, deposes and says:

1. I have recently reviewed my initial August 2, 2012 Affidavit in Support of my motion for conditional class certification. I reaffirm all of the statements in that earlier Affidavit.

2. I understand that the Court has requested that the Plaintiffs' conditional class or collective action motion, which was initially filed several months ago, now be re-filed.

3. I submit this Supplemental Affidavit In Additional Support of Plaintiff's Motion for Conditional or Preliminary Collective Action Certification.

4. Based on my personal knowledge, which I acquired while by with the Defendants, the Defendants have over the past several years, owned and/or operated five retail stores in New York City.

5. Based on my personal knowledge, at all relevant times, the individual Defendant and owner of all of the corporate Defendants and the various "Bond No. 9" fragrance stores, Ms. Laurice

Rahme, was personally and directly involved in all aspect of the Defendants' personnel management. In fact, I reported to and was supervised by Ms. Rahme throughout my employment.

6. Based on my personal knowledge, Ms. Rahme personally interviewed all job candidates for retail sales positions, and made all hiring, firing, and promotion related decisions.

7. Based on my personal knowledge, Ms. Rahme directly supervised all sales employees at all of her retail stores, and did not grant management authority to her "store managers."

8. Based on my personal knowledge, Ms. Rahme determined how much each retail sales employee was to be paid, and also made all decisions regarding increases or decreases in employee pay.

9. During the 2008 to 2012 time period, when I was employed at the "flagship" Bond No. 9 store in lower Manhattan, I personally had the opportunity to meet approximately fifty (50) retails sales employees of the Defendants. This was because Ms. Rahme's business office was located in the basement of the Bond No. 9 store.

10. All candidates for retail sales associate positions had to come the 9 Bond Street store to meet with, and be interviewed by, Ms. Rahme.

11. Newly hired retail sales associates underwent two (2) weeks of training at the 9 Bond Street store. In fact, I personally trained many newly hired sales associates.

12. All retail sale employees hired to work at the various Bond No. 9 fragrance boutiques had the same job functions, and all were under the supervision of Ms. Rahme. The job was essentially the same, namely, to sell "high end" fragrances to customers and register sales.

13. Individual store managers did not run their stores according to their own preferences and the retail sales work at the various stores did not materially differ.

14. All retails sales associates were trained pursuant to a common plan or system, that was centrally directed and controlled by Ms. Rahme from her headquarters in the basement of 9 Bond

Street.

15. Based on my personal knowledge, Ms. Rahme maintained complete control over the compensation and payroll system regarding all retails sales employees at her stores. The administrator of the payroll system, who reported directly to Ms. Rahme, and who had to do whatever Ms. Rahme asked, was Ms. Hormidas Caloobanan.

16. Based on my personal knowledge, many retails sales employees spoke with one another and also complained to their store managers about how their hours were being calculated for payroll purposes. However, no information about how retail sales employees wages were calculated ever was supplied to the employees by Ms. Rahme or Ms. Caloobanan.

17. Throughout my employment in the 2008 through 2012 time period, Ms. Rahme had complete control over employee schedules, and no retail sales employee could change his or her schedule unless the proposed change was approved by Ms. Rahme.

18. Throughout my employment in the 2008 through 2012 time period, the retail sales employees were paid twice a month, on the 15th day of each month and again on the 30th or 31st day of each month. Thus, twenty-four regular paychecks would be issued to a retail sales employee working a full twelve-month calendar year.

19. The paychecks that the retail sales employees amounted to pay for forty-eight weeks a year rather than fifty-two weeks a year. I know this because Ms. Hormidas Calooban told me that each paycheck was for two weeks of work.

20. I now realize and appreciate that the payroll system described above resulted in me and other retail sales employees losing between two to four weeks of pay each year, because each year is composed of approximately fifty-two full weeks.

21. The compensation system described above was in place throughout the entire time I worked for the Defendants between 2008 and 2012.

22. Throughout my employment, I consistently worked more than forty (40) hours a week. I know this because on weekdays, the store where I worked was open from 10:30 AM to 8:30 PM (ten hours) and I had to be at the store a half an hour before opening time, and had to remain at the store between fifteen to twenty (15-20) minutes after closing time. I, along with other retail sales employees, was not allowed to take breaks, and often was not permitted to take a lunch hour. Therefore, even on those weeks when I worked only five days, I was working in excess of forty hours a week, and closer to fifty (50) hours a week.

23. Moreover, I often was asked to work an additional or sixth day each week, particularly during Christmas holiday seasons. I did not receive any additional compensation for that extra day. Ms. Rahme occasionally promised me that I would be given paid time off in the future to "make up" for extra days worked during busy periods, but to the best of my recollection this never happened.

24. Based on my person knowledge, similar promises were made to other retail sales employees when they were asked to work extra days. However, no compensatory paid time-off was provided.

25. In fact, I did not receive any additional compensation, whether "overtime" or "straight" time for those hours I worked in excess of forty hours a week except on one discrete occasion.

26. On my paystubs, no actual hours worked were shown, and it did not appear that any particular calculation of hours actually worked had even been made.

27. In fact, there was no time clock at the store where I worked, and I along with other retails sales employees in had to simply "call in" and "call out" to a telephone number when we arrived and left work.

28. In know that my experiences related above were typical of those of other retail sales employees because we often spoke about these matters with one another.

29. In particular, many retail sales employees expressed their frustration and dissatisfaction to me with how they were compensated, and in particular, with how their wages were determined. To my knowledge, no retail sales employees were ever offered any explanations by Ms. Rahme or Ms. Caloobanan regarding the calculations of their wages

*VERONICA ROBLEDO*

Sworn to before me this 28th day of August 2013

Notary Public, State of New York