# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

VERONICA ROBLEDO, Individually And On Behalf Of All Other Persons Similarly Situated,

      *Plaintiffs*,

-against-

No. 9 PARFUME LEASEHOLD,
LAURICE & CO. UPTOWN, INC.,
LAURICE WASHINGTON LTD.,
LAURICE & BLEECKER CORP.,
LAURICE SOUTHAMPTON, INC.,
LAURICE MADISON LTD., and
LAURICE RAHME, Individually,

      *Defendants*.
------------------------------------------------------------------X

12 CV 3579 (ALC)(DCF)

**AFFIDAVIT OF KARIN MARIA WIDMANN REGARDING HER INTERACTIONS WITH ATTORNEY DENNIS A. LALLI DURING THE COURSE OF HER EMPLOYMENT WITH DEFENDANTS**

  **KARIN MARIA WIDMANN**, being duly sworn, and subject to the penalties for perjury, deposes and says:

  1. I am a permanent resident of the United States and I have resided in New York State for over ten (10) years.

  2. I understand that Plaintiffs are applying for an Order to Show Cause and that this application seeks to have counsel for the Defendants, Dennis A. Lalli ("attorney Lalli") and his law firm, Bond, Schoeneck & King, PLLC, disqualified from this action. I also understand that this request is based on the fact that attorney Lalli's own recollections and statement are directly at issue and also because of attorney Lalli's history of pressuring witnesses to commit perjury. I understand that this Affidavit will likely be used in support of Plaintiffs' application.

Widmann Affidavit of September 25, 2012
Re: Interactions with Attorney
Dennis A. Lalli – 1

## MY BACKGROUND PRIOR TO MY
## EMPLOYMENT WITH DEFENDANT LAURICE RAHME

3.  Prior to becoming associated with the Defendants in this action, I acquired fourteen (14) years of experience in the beauty and perfume industry.

4.  Immediately prior to commencing employment with the Defendants, I was employed as a Business Manager with a perfume company called By Kilian based at Bergdorf Goodman department store in New York City.

## THE BEGINNING OF MY
## EMPLOYMENT WITH DEFENDANT LAURICE RAHME

5.  In or around June 2011, I was introduced to Defendant Laurice Rahme ("Defendant Rahme") by a former employee of mine who, at that point was working at Defendants' flagship perfume boutique at 9 Bond Street, New York, New York 10012.

6.  Defendant Rahme personally recruited me to work at the 9 Bond Street location as Store Manager. A written offer was extended to me and I accepted this position.

7.  I was employed as the Store Manager at that location from on or about July 5, 2011 to on or about February 15, 2012.

8.  Although I was given the title of "Store Manager," Defendant Rahme never gave me responsibilities or authority to hire, fire or exercise independent judgment with respect to store operations. All decisions were made by Defendant Rahme.

## HOW I FIRST MET ATTORNEY LALLI

9. Throughout the duration of my employment with the Defendants, I saw the Defendants' outside employment attorney, Dennis A. Lalli no fewer than ten (10) times. That is, I saw him at least ten (10) times in eight (8) months. I thought that it was unusual to see an outside attorney make such frequent visits to the store.

10. In fact, when I first began working at the 9 Bond Street store in July 2011, I would frequently see attorney Lalli at the store speaking with other employees, especially former Store Manager Michele Vasapoli, the corporate-wide Director of Wholesale Operations Christine Piccola and the corporate-wide Office Manager Hormidas Caloobanan.

11. Defendant Rahme in fact conducted her corporate-wide business from a suite of offices located in the basement immediately beneath the 9 Bond Street store. Two (2) staircases connected the office suite with the street-level retail space.

12. When I first arrived, I had no idea who attorney Lalli was or what his role was, but Defendant Rahme, who was my supervisor, and the owner of Defendant Bond No. 9, introduced me to him early in my employment. Defendant Rahme explained to me that attorney Lalli was her principal outside employment lawyer. Defendant Rahme explained that attorney Lalli worked closely with her regarding issues involving former and current employees. Defendant Rahme told me that "[attorney Lalli] was very good" and "a superstar." Defendant Rahme further told me that I would be seeing attorney Lalli at the store often and that I should get to know and become friendly with him.

13. In fact, in the course of my employment, I became aware of the fact that Defendant Rahme had frequent disputes with her current and former employees. I also became aware of the

fact that Defendant Rahme typically worked extremely closely with attorney Lalli regarding those disputes.

### ATTORNEY LALLI'S PRESSURING OF
### WITNESSES TO TESTIFY FALSELY

14. These joint efforts by Defendant Rahme and attorney Lalli to thwart complaints, claims and even inquiries by current and former employees often included the use of current employees as supporting witnesses. Frequently, Ms. Piccola and Ms. Caloobanan were recruited to participate in these efforts.

15. I personally witnessed attorney Lalli work closely with Ms. Piccola and Ms. Caloobanan to review and rehearse proposed witness statements and testimony.

16. It was not long into my employment when I, too, was approached by Defendant Rahme and attorney Lalli in connection with an employment matter.

### THE AUGUST 2011 INCIDENT INVOLVING JOAN BOLICK

17. Specifically, in approximately August 2011, about one (1) month after starting to work at the store, I arrived at the store at about 10:30 AM to prepare it for an 11:00 AM opening. Typically, on weekdays, office staff who worked downstairs in the office suite, including Defendant Rahme, would already be at work when I arrived to open the store.

18. On that August 2011 morning, upon arrival at the store, I saw Defendant Rahme and Joan Bolick, the then corporate-wide Director of Product Development, sitting and speaking in the back of the store.

Widmann Affidavit of September 25, 2012
Re: Interactions with Attorney
Dennis A. Lalli – 4

19. I could see that Defendant Rahme and Ms. Bolick were deep in conversation, but I could not ascertain what they were talking because their conversation was at a very low volume and I could not hear what they were saying.

20. I deliberately did not approach them because I did not want to disrupt or intrude upon their conversation.

21. When it was opening time for the store (11:00 AM) and I had just unlocked the door, so that customers could come in, I saw Ms. Bolick, with tears in her eyes, walk past me and out door. Ms. Bolick was trying to cover her face with her sunglasses. She left in silence and did not speak to me.

22. Defendant Rahme then got up and approached me, and told me in a highly agitated voice to "Call Hormidas [Ms. Caloobanan], call Hormidas [Ms. Caloobanan]!" Defendant Rahme then said, "Can you believe this, she [Ms. Bolick] was trying to sabotage my business by deliberately not paying vendors and other parties and give my company a bad business reputation . . . I fired her."

23. After I had dialed Ms. Caloobanan's extension at her office downstairs, Defendant Rahme gestured for me to hand her the telephone. I handed the telephone to Defendant Rahme and she directed Ms. Caloobanan to "come upstairs immediately!"

24. Moments later, Ms. Caloobanan came running upstairs, spoke briefly to Defendant Rahme and ran out the door and into the street.

25. Defendant Rahme followed her to the door and waited there expectantly.

26. Several days after this incident, attorney Lalli came to the store and attempted to coach me by discussing what I would say about the incident involving Ms. Bolick. Attorney

Lalli told me, "What I would really like you to say [in an upcoming court proceeding regarding Ms. Bolick] is that she was physically threatening [Defendant Rahme] and that you saw this."

27. I told attorney Lalli that I did not witness any threatening statements or actions by anyone and that I was only willing to tell the truth. Despite this, <u>attorney Lalli repeatedly pressured me to say things that I knew were not true and that I told him were not true</u>. Defendant Rahme was present and witnessed attorney Lalli attempting to pressure me to lie and stated, "You don't remember it like Dennis [attorney Lalli] says, what are you, stupid?"

## ATTORNEY LALLI'S PRESSURING OF HORMIDAS CALOOBANAN TO TESTIFY FALSELY

28. <u>I personally witnessed attorney Lalli attempting to get Ms. Caloobanan to lie on behalf of the Defendants on numerous occasions.</u> I know Ms. Caloobanan to be a deeply religious woman. Whenever attorney Lalli attempted to coach her, and encourage her to lie about employee issues, Ms. Caloobanan would grasp an old photograph of her daughter that she always kept in her possession. She would softly repeat to herself, praying aloud, "God forgive me," and "please don't let anything happen to my daughter," and "God forgive me, I'm doing this for my daughter." It was obvious that Ms. Caloobanan was very concerned about the consequences of lying for her employer.

29. On these occasions, Ms. Caloobanan would physically shake with fear.

30. I personally witnessed attorney Lalli, on numerous occasions, provide Ms. Caloobanan with pieces of paper that he referred to as "cheat sheets," which, in fact were statements prepared by attorney Lalli which he wanted Ms. Caloobanan to review and memorize.

Widmann Affidavit of September 25, 2012
Re: Interactions with Attorney
Dennis A. Lalli – 6

31. Whenever Ms. Caloobanan was given these attorney-prepared "cheat sheets," they would shake in her hands.

32. I personally witnessed attorney Lalli aggressively coach Ms. Caloobanan between five (5) and ten (10) different times.

33. For example, on the day of one of the hearings involving Ms. Bolick in January 2012, a group of us, including attorney Lalli, Defendant Rahme, Ms. Piccola, Ms. Caloobanan and myself left the 9 Bond Street store at or around 11:00 AM in a chauffeured car to go to the hearing. We returned together to the store at or around 3:00 PM.

### ATTORNEY LALLI'S PRESSURING OF ME TO TESTIFY FALSELY

34. In the car on the way to the hearing, attorney Lalli once again said to me, "You were in the store the morning that [Ms. Bolick] and [Defendant Rahme] were talking, and you saw that [Ms. Bolick] was making threatening movements toward [Defendant Rahme], right?"

35. I once again told him that I did not witness that and was only willing to tell the truth.

36. Attorney Lalli was persistent and said, "That's not what I want you to say. What I really want you to say is that [Ms. Bolick] put her hands up like this [on the side, raising her body] and made gestures toward [Defendant Rahme] and lifted her body [demonstrating a pounce-ready position],"

37. As discussed, Defendant Rahme was in the car with us listening to this conversation.

38. Defendant Rahme then that Ms. Caloobanan had rushed after Ms. Bolick on the morning in question in order to retrieve Ms. Bolick's company-issued Blackberry.

39. Defendant Rahme also was pressuring me to testify about "what I actually saw that day." Defendant Rahme was in fact strongly encouraging me to lie.

40. I again explained to everyone in the car, that on the morning at issue, I did not see Ms. Bolick moving in any manner that was at all threatening towards anyone, and all I saw was two (2) women having a serious, low-volume conversation that I could not hear. I again reiterated that I simply could not say what attorney Lalli and Defendant Rahme were asking me to say because it was not true.

41. At that point, attorney Lalli said that it did not matter that I could not say what wanted me to and that he still wanted me to attend Ms. Bolick's hearing with the rest of the group.

42. In the car and again in the hallway outside the hearing room, everyone from our group except for me was studying the "cheat sheets" that attorney Lalli had prepared and distributed. Ms. Caloobanan was visibly shaking because she was so afraid about having to lie.

43. Attorney Lalli asked me one last time, "One more time, you heard [Ms. Bolick] raising her voice at [Defendant Rahme], right?"

44. I again replied that "I could not say that in court; I can't lie in court or I'll get messed up,"

45. Ms. Piccola, on the other hand, advised attorney Lalli, "Don't worry, I know what to say," as she was busy studying the "cheat sheet" that attorney Lalli had provided her. Ms. Piccola was preparing to testify that she observed Ms. Bolick on her last day of employment, that

Ms. Bolick was not working and did not appear to intend to work, and that she was voluntarily removing personal items from her desk drawers. Ms. Piccola was also preparing to testify that she saw Ms. Bolick throw her Blackberry at Ms. Caloobanan.

46. Ms. Piccola was rehearsing her testimony with attorney Lalli, and was specifically preparing to testify that on Ms. Bolick's last day, Ms. Caloobanan had gone to the Defendants' other Bond Street location simply in order to retrieve an invoice, and had not done so to chase after Ms. Bolick or to obtain her Blackberry.

47. Attorney Lalli instructed Ms. Piccola and Ms. Caloobanan to "make sure that [they] both [spoke] the same language and to both testify that [Ms. Caloobanan] went to [the other Bond Street location simply] because she needed the invoice."

48. At that point Defendant Rahme interrupted attorney Lalli and turned to Ms. Caloobanan and said, "Remember, I did not send you to get the Blackberry. [Ms. Bolick] just gave it to you when you saw her [at the other office] when you went to get the invoice."

49. Attorney Lalli at this time was also coaching Defendant Rahme to testify about how "scared [Defendant Rahme] felt [during her meeting with Ms. Bolick]."

50. I am not certain if the hearing in question was an unemployment benefits hearing. However, on at least one occasion during my employment with the Defendants, Defendant Rahme told me, "no matter what, no one gets to collect unemployment [benefits]." Defendant Rahme also said that she would be willing to miss business meetings or appearances as well as reschedule business appointment in order to attend unemployment hearings and challenge claims by former employees. She stated that she wanted to personally oppose any unemployment

claims filed against her company unless they were easy claims to oppose and could be delegated to others to handle.

### ATTORNEY LALLI PRAISES
### HORMIDAS CALOOBANAN FOR TESTIFYING FALSELY

51. Immediately after Ms. Bolick's January 2012 hearing, attorney Lalli said to Defendant Rahme, "Hormidas [Ms. Caloobanan] did excellent, she repeated her lines perfectly, and she seemed a little nervous which came across great." Defendant Rahme then said, "[Ms. Caloobanan] is a superstar."

52. The January 2012 hearing was not the first such hearing. I had previously been to two (2) prior hearings regarding Ms. Bolick's employment issues.

53. I also went to one unemployment hearing regarding Diana Romano, a former Sales Associate for Defendants in late 2011 or early 2012.

### ATTORNEY LALLI'S ACCUSATIONS
### AGAINST ME IN HIS TERMINATION LETTER

54. When I myself was terminated by the Defendants in February 2012, the notice of termination was conveyed to me in a letter from attorney Lalli. No one other than he ever advised me that I had been terminated or why. In his letter, attorney Lalli accused me of personally stealing approximately fifty thousand dollars ($50,000) from the Defendants.

55. Upon receipt of this letter, which both my husband and I considered preposterous and outrageous, my husband telephoned the 9 Bond Street store to express his outrage over attorney Lalli's allegations.

Widmann Affidavit of September 25, 2012
Re: Interactions with Attorney
Dennis A. Lalli – 10

56. That same day, shortly after my husband's telephone call, attorney Lalli called me up and said he wanted to discuss his false accusations that I had stole from the Defendants. "Karin, I want to meet with you, let's put this insanity behind us."

57. Since that date, I have not had any direct dealings with attorney Lalli or Defendant Rahme.

58. I understand that the incidents described and detailed herein constitute adequate grounds for the disqualification of attorney Lalli and his firm, Bond, Schoeneck & King, PLLC.

59. I am prepared to testify live in open court regarding the incidents detailed herein.

_____
KARIN MARIA WIDMANN

Sworn to before me this
25th day of September 2012

_____
Notary Public



Peter John Andrews
Notary Public - State of New York
No. 02AN6235372
Qualified in New York County
My Commission Expires 2/07/2015

Widmann Affidavit of September 25, 2012
Re: Interactions with Attorney
Dennis A. Lalli – 11